UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TONDA K. COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:09-CV-1277-TWP-TAB |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Tonda K. Cooper ("Cooper"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), who denied Cooper's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §405(g). For the reasons set forth below, the Court **AFFIRMS** the decision of the Commissioner.

### I.  BACKGROUND

On December 8, 2004, Cooper filed an application for a period of disability and DIB alleging that she became disabled on July 7, 2004. (Tr. 32, 86). Cooper's application was denied on April 4, 2005 (Tr. 51), and upon reconsideration was denied again on June 28, 2005. (Tr. 46). On July 21, 2005, Cooper made a request for hearing before an Administrative Law Judge ("ALJ") (Tr. 45), and a hearing was held on April 23, 2008. (Tr. 816).

**A.  Cooper's Work History**

Cooper was born on November 21, 1963, and was 44 years old at the time of the ALJ's decision. (Tr. 23). Cooper completed her twelfth grade education in approximately 1996. (Tr.

83). From 1986 to 1997, Cooper worked 40 hours a week as a plastic fabricator. (Tr. 79). From 1997 until 2004, Cooper worked 40 hours a week for Rolls Royce North America, as a press operator. (Tr. 79, 830). Cooper discontinued working in July 7, 2004 due to her medical condition and considers this date as her disability onset date. (Tr. 79).

**B. Medical History**

Cooper reported that she was unable to work due to a sleeping disorder, restless leg syndrome, migraines, depression, anemia, asthma, and thyroid problems. (Tr. 78).

<u>**Cooper's Physical Health**</u>

**(1) Sleep Apnea and Restless Leg Syndrome**

On March 12, 2001, Cooper underwent a full polysomnography for snoring and hypersomnolence at St. Francis Hospital. (Tr. 112). Upon the completion of the study, R.G. Shellman M.D. ("Shellman") diagnosed Cooper with sleep apnea syndrome with a respiratory disturbance index and periodic leg movement. (Tr. 112). On May 1, 2001, Cooper underwent a second polysomnography at St. Francis Hospital after which Shellman concluded that Cooper's sleep disordered breathing was adequately controlled by continuous positive airway pressure ("CPAP"). (Tr. 125). On October 1, 2003, Cooper was again seen by Shellman, who reported that Cooper was not taking her medication for periodic leg movements, and consequently the excessive somnolence became worse. (Tr. 297).

On November 8, 2004, Cooper reported to M. Arnold N.P. of Madison Avenue Family Practice that she fell asleep at her hydraulic press almost daily. (Tr. 206). During a January 19, 2007, consultation with Jason Fleming M.D. of Indiana Heart Physicians, Cooper reported that she had not been wearing her CPAP for a few months because it dried out her nasal passageways. (Tr. 664).

**(2) Headaches**

On June 19, 2003, Joseph McPike, M.D., filled out paperwork for Cooper's insurance and he noted that Cooper suffered from migraine headaches, a chronic condition which began in 1990. (Tr. 314). On July 14, 2003, Cooper had a head CT performed at St. Francis Hospital with an admitting diagnosis of headaches, but the results of the exam found no abnormalities. (Tr. 311). In March of 2007, Cooper reported to her doctor that she was taking Aleve daily for headaches and had been to the emergency room twice due to severe headaches. (Tr. 652)

**(3) Anemia and Asthma**

On December 16, 2004, Krisi Kerner, M.D. ("Kerner") completed a physician report for Cooper's disability plan administrator from Rolls-Royce North America. (Tr. 201). Kerner diagnosed Cooper with asthma, sleep apnea, depression and anxiety. (Tr. 201). Kerner's objective medical findings were shortness of breath, fatigue, anxiety and anemia. (Tr. 201). Kerner stated that Cooper was not able to return to work and it was unknown at that time when she would be able to return to work. (Tr. 201).

From January of 2005 through October of 2007, Cooper was seen by Mary Lou Mayer, M.D., of St. Francis Hospital for iron and vitamin B12 deficiency. (Tr. 507, 519, 522, 526, 527, 529, 537, 540, 543, 544). Dr. Mayer initiated vitamin B12 replacement upon which Cooper's blood cell counts normalized. (Tr. 507, 519, 522, 526, 527, 529, 537, 540, 543, 544).

On February 15, 2005, Cooper underwent a colonoscopy to evaluate for any cause of chronic Gastro-Intestinal blood loss. (Tr. 142). J. Scott Buckley, M.D. of St. Francis Hospital reported "normal colonoscopy to the cecum with no lesions to explain the patient's iron-deficiency anemia." (Tr. 142).

On March 8, 2005, Cooper underwent endoscopy with a pre-operation diagnosis of iron deficiency anemia. (Tr. 139, 793). Cooper's post-operation diagnosis was "normal evaluation of celiac sprue." (Tr. 139, 541, 792).

On April 18, 2005, Cooper underwent a Pulmonary Function Study. (Tr. 108). Robert Daly, M.D., FCCP ("Daly") interpreted the results of the study and diagnosed Cooper with asthma. (Tr. 108). Daly noted "isolated decrease in corrected diffusion in the context of normal spirometry, lung subdivisions and airways resistance. This data is seen in circumstances of emphysematous obstructive lung disease, pure emphysema and pulmonary embolic disease." (Tr. 108). Daly further noted that the airway resistance and conductance were normal. (Tr. 108).

On May 25, 2005, Cooper saw Daly for a consultation. (Tr. 98,771). Daly noted Cooper had no allergies, but the pulmonary functions suggested some evidence of small airways disease as manifested by decreased corrected diffusion, which might be compatible with occupationally acquired asthma. (Tr. 98,771). Daly placed Cooper on the drug Singulair. (Tr. 98,771).

On June 3, 2005, Cooper underwent an esophageal x-ray, which revealed "mild gastroesophageal reflux." (Tr. 104). On June 29, 2005, Cooper followed up with Daly, who noted evidence of small airway disease and decreased corrected diffusion. (Tr. 756). On July 25, 2005, Daly performed a screening sirogram and noted that Cooper's airway hyperactivity was controlled with cigarette cessation, absence from workplace exposure and the medications, Zyrtec, Advair, Xopenex and Singulair. (Tr. 754).

From October 12, 2005, through February 19, 2008, Daly injected Cooper with Xolair, which helped her breathe easier. (Tr. 417, 418,440, 441, 712-13, 804-10). On February 26, 2006, after another administration of Xolair, Daly noted that Cooper's asthma was "nicely controlled with little wheezing, coughing and chest tightness. Xolair has been effective." (Tr. 712-13). On

4

April 24, 2007, Cooper received another injection of Xolair because of an asthma attack three days prior. (Tr. 418). On May 15, 2007, Daly administered another injection of Xolair and noted that Cooper's reaction as doing okay and that she wears a mask during yard work. (Tr. 417). On February 19, 2008, Daly noted that Cooper's pulmonary function studies showed improvement, her chest x-rays were clear and because Cooper was receiving Xolair, she was requiring little to no medication. (Tr. 804-10). On July 8, 2008, during a methacholine challenge study, Daly noted that Cooper showed mild symptoms of shortness of breath. (Tr.624).

**(4) Thyroid**

On October 30, 2006, Cooper underwent a total thyroidectomy surgery performed by Jason Gutt, M.D. (Tr. 554). On September 11, 2007, during a post-operation consultation, Dr. Gutt noted that Cooper continued to do well, but against medical advice she continued to smoke cigarettes. (Tr. 646).

**Cooper's Mental Health**

**(1) Mental Status/Psychiatric Evaluations**

On September 9, 2004, Cooper underwent a psychiatric evaluation with William Wiseman, M.D. ("Wiseman"). (Tr. 209). Wiseman diagnosed Cooper with panic disorder with agoraphobia and dysthymia stressor. (Tr. 332). Wiseman assigned Cooper a Global Assessment of Functioning ("GAF") score of 65.[1] (Tr. 332). Wiseman found that many of Cooper's symptoms are due to stressors including her conflict at home and medical problems. (Tr. 209).

---

[1] "The GAF scale is to be rated with respect only to psychological, social, and occupational functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32 (2000). The GAF range of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia or some difficulty in social, occupational, or school functioning, "but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. at 34.

On March 25, 2005, at the request of Social Security Administration, Cooper was evaluated by psychologist Howard Wooden, Ph.D., HSPP. ("Wooden). (Tr. 174). Cooper informed Wooden that she suffered from severe allergies, sleep apnea with restless leg syndrome and was currently on CPAP. (Tr. 174). Cooper reported that she had COPD along with asthmatic bronchitis. (Tr. 174). Cooper stated that she suffered from anxiety attacks and always has had severe depression. (Tr. 174). Cooper further stated that she had sleep problems, did not want to get out of bed, did not want to be around people, did not care about her hygiene, had decreased motivation and cried a lot. (Tr. 174).

As to Cooper's anxiety she indicated that she did not know what brought it on, but she gets it in her chest, her heart rate increases and it causes her to not be able to sleep. (Tr. 174). Based on these symptoms, Wooden opined that Cooper described a generalized anxiety rather than an anxiety or panic attack *per se*. (Tr. 174).

Wooden performed a mental status examination on Cooper and concluded that Cooper's cognitive skills and reality testing were intact, and she was moderately concrete in regard to her verbal reasoning skills. (Tr. 174).Wooden noted that Cooper showed evidence of moderate depression with probable dysthymia and secondary anxiety. Due to limited information provided to Wooden, he was unable to comment as to Cooper's somatization disorder. (Tr. 174). Wooden diagnosed Cooper with dysthymia with secondary anxiety. [2](Tr. 174). Wooden ruled out somatization disorder and assigned Cooper a GAF score of 70. (Tr. 174).

On April 1, 2005, J. Pressner, Ph.D./JAP ("Pressner") completed a psychiatric review technique form. (Tr. 160). Pressner found that Cooper had a mild restriction of activities of daily

---

[2] In 2006 and 2007, several treatment notes made at Madison Avenue Family Practice indicated that Cooper's anxiety was either controlled by her medication or in good condition. (Tr. 645, 730).

living and difficulties in maintaining social functioning. (Tr. 170). Pressner further found that Cooper did not have limitations in maintaining, concentration, persistence and pace, or episodes of decompensation. (Tr. 170).

Pressner indicated that Cooper was pleasant, cooperative and credible and did not show any signs of anxiety. (Tr. 172). Pressner noted that Cooper's reports of functioning indicated that she drives, reads, does minor house cleaning, cooking, and laundry. (Tr. 172). Pressner opined that Cooper's condition was not severe. (Tr. 172).

**Social Security**

**(1) Physical RFC Assessment**

On March 31, 2005, Cooper underwent a physical residual functional capacity ("RFC") assessment with J. Sands, M.D., JOS ("Sands"). (Tr. 177). Sands found that Cooper had no exertional, postural, manipulative, visual, or communicative limitations. (Tr. 178-81). Sands found environmental limitations and opined that Cooper should avoid concentrated exposure to extreme cold, extreme heat and fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 181).

**(2) Social Security Disability Examination**

On February 21, 2005, Cooper underwent a disability examination with Doug Poplin, M.D., MPH. (Tr. 185). Dr. Poplin's impression was asthma, obstructive sleep apnea with restless leg syndrome, reported history of unspecified type of anemia, depression, hypothyroidism, acid reflux, and history of multiple allergies causing recurrent uticaria with angioedema. (Tr. 187).

**C. The Hearing**

**(1) Cooper's Testimony**

At the hearing held on April 23, 2008, Cooper testified that she stopped working during the summer of 2004 because she was getting asthmatic bronchitis at least two weeks each month.

(Tr. 819). Cooper's main complaint was asthma and staying awake, but she also has anemia, thyroid problems and depression. (Tr. 820,824-25).

Cooper testified that her asthma became a 'real problem' in 2004, however, stabilized when she quit smoking. Cooper testified that she was still unable to vacuum. (Tr. 820-21). Many things set off her asthma, but the Xolair shots helped her. (Tr. 820). Cooper testified that when her asthma worsens, she used the inhalers and the machines to prevent a crisis from happening, and this has worked to date. (Tr. 821).

As to the sleep apnea, Cooper testified that she cannot stay awake and sometimes she dozes off while standing up. (Tr. 839). Cooper testified that she takes a half-hour nap every three hours and probably sleeps 15 hours over the course of one day. (Tr. 824,839). Cooper testified that she does not drive long distances, but she drives to the grocery store and takes her son to school. (Tr. 822-23). Cooper further testified that she has not suffered any physical injuries when she has fallen asleep, and she does not have any problems sitting down for a long period of time except for staying awake. (Tr. 826). Cooper testified that she uses CPAP, which is a breathing machine, while she sleeps. (Tr. 8234).

As to the anemia, Cooper testified that when her iron gets to a certain point she becomes more tired and has to take iron supplements. (Tr. 824). Cooper testified that she has suffered from depression all of her life and that she has undergone counseling, and she "stopped going because of getting up and motivating herself to go." (Tr. 825-26). Cooper testified that her mental condition would interfere with her job at this time because she becomes so depressed that she finds herself angry and takes it out on others. (Tr. 838). Finally, Cooper testified that since she has been off work, she does not get bronchitis as often. (Tr. 843). When asked by the ALJ

why she did not get another job, Cooper testified that she could not be around chemicals or vacuuming and she cannot even clean her bathrooms. (Tr. 845).

### (2) Medical Expert's Testimony

At the hearing, Julian Freeman M.D. ("Freeman") testified as a medical expert. (Tr. 845). The ALJ requested that Freeman confine his testimony exclusively to Cooper's medical records, independent of claimant's testimony. (Tr. 845). Freeman testified that the record indicated an underlying problem of both vitamin B12 and iron absorption, and that although a replacement therapy has begun, the prescribed dosage was inadequate. (Tr. 846-47). Freeman testified that B12 deficiency leads to a wide variety of problems which could cause conditions simulating depression. (Tr. 847). When asked whether Cooper has any of the things to the point that she is disabled, Freeman referred to the February 2005 psychological evaluation and testified that the diagnosis of dysthymia is a form of depression. (Tr. 847).

Freeman further testified that the combination of findings was primarily indicative of an esotilic interstitial lung disease, although the doctors have not given her this diagnosis and Cooper has not had a biopsy confirming this. (Tr. 848). Freeman stated that the usual diagnosis suggests this to be Churg-Strauss syndrome, which "causes fibrosis and inflammation of the membrane that oxygen must cross to get from the air into the blood stream." (Tr. 848-49).

Freeman testified that Cooper's sleep apnea condition was evident due to the 2001 polysomnograhy study which placed her on a CPAP machine. (Tr. 849). Freeman stated that the severity of Cooper's sleep studies indicated that "it would not be amendable to full control by the CPAP." (Tr. 853). When asked by the ALJ whether the studies were done before or after Cooper used CPAP, Freeman stated that they were done before, "but the problem is that they predict that the CPAP should not be able to give full control."(Tr. 853). Freeman stated that the record does

9

not have many reports on Cooper's sleep apnea, and the only report that gave Freeman a concise description of the somnolence was Wooden's mental status evaluation. (Tr. 849). The ALJ instructed Freeman not to refer to Wooden's report because the ALJ could not accept it as a medical report of the degree of somnolence as the psychologist was not qualified to make a diagnosis of this nature. (Tr. 849). When Freeman was questioned by Cooper's counsel, Freeman admitted that if he could consider the degree of spontaneous sleepiness from Wooden's mental status examination, Cooper would meet the 12.04 listing. (Tr. 854). The ALJ requested from Freeman to point out the documents Freeman was referring to when opining that Cooper meets the listing, after which Freeman testified that he was basing his opinion on Cooper's statements made to Wooden during the mental status examination and not on a medical finding. (Tr. 856-57).

The ALJ questioned Freeman as to whether any of Cooper's conditions met an impairment listing. (Tr. 851). Freeman testified that if Wooden's report is excluded, then Cooper's sleep apnea is "insufficient to evaluate under equivalency to an 11.03 listing." (Tr. 851). Freeman testified that Cooper fell short of equaling the chronic pulmonary insufficiency listing 3.02 and does not meet it. Freeman further testified that the B12 deficiency does not meet or equal a listing if the ALJ excludes the psychological report. (Tr. 851).

### (3) Vocational Expert's Testimony

Vocational expert ("VE") Robert Barber also testified at the hearing. (Tr. 860-68). The VE testified that Cooper's past work as a plastic fabricator was medium, semi-skilled with a Specific Vocational Preparation ("SVP") of three and her job as a press operator was also medium, semi-skilled but with an SVP of four. (Tr. 860). The VE testified that there were no transferrable skills to light or sedentary work. (Tr.860).

The ALJ questioned the VE as to whether there were any jobs which could be performed by a person with Cooper's age, education, and work experience, who can work at the sedentary level but with the following limitations: (1) must avoid work at unprotected heights and around dangerous moving machinery; (2) requires an environment relatively free of noxious fumes, gasses, respiratory irritants and extremes of temperature and humidity. (Tr. 860). The VE testified that such jobs did exist and reported that a person with these limitations could perform work as a telephone quotation clerk noting 1,820 such jobs in the Indiana region, a pari-mutuel ticket checker, noting 1,260 jobs in the region, and a general office clerk, noting 1,210 jobs in the region. (Tr. 861).

The ALJ then posed the same hypothetical question to the VE, except he changed the level of work to light exertion. (Tr. 861) The VE testified that a person with Cooper's credentials could perform work as a cashier and there were 22,350 such jobs in the region, as a housekeeper, with 2,230 such jobs regionally, as an information clerk with 1,430 jobs in the region and as an airline security guard with 2,120 such jobs. (Tr. 861-62) Upon further questioning by the ALJ, the VE eliminated the housekeeper as possible job for Cooper due to chemical involvement. (Tr. 861).

Finally, the ALJ posed a hypothetical question to the VE, and inquired about the jobs in the work economy for the same individual who could only participate in work activities less than 8 hours a day. (Tr. 862). The VE testified this person would not be able to perform these jobs. (Tr. 862).

Upon questioning by Cooper's attorney, the VE testified that if Cooper could not tolerate a work environment where there could be an exposure to perfume, cleaning and dust, then the jobs that were available before would not be doable. (Tr. 865-66). As to a person who has

spontaneous instances of sleep several times a day, the VE testified this person would not be able to perform the duties of these jobs. (Tr. 867).

The ALJ issued his denial decision on May 22, 2008. On May 28, 2008, Cooper requested a review of the hearing decision which was denied on August 24, 2009. Upon the Appeals Council's denial of the review, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. §404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Cooper now requests review of the ALJ's decision pursuant to Title II of the Social Security Act, 42 U.S.C. 405(g).

## II. STANDARD OF REVIEW FOR DISABILITY DETERMINATION

To be eligible for disability insurance benefits, a claimant must establish a disability under 42 U.S.C. §423. Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled, the ALJ must evaluate the claim based on the five-step sequential evaluation process set forth in 20 C.F.R. §404.1520(a)(4). At step one, the ALJ must consider whether the claimant is engaged in a substantial gainful activity, and if so, the claimant is not disabled. *Id*. Second, the ALJ considers the medical severity of the claimant's impairment, and if the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement set forth in 20 C.F.R. 404.1509, or a combination of impairments that meets the duration requirement, the claimant is not disabled. *Id*. In the third step of the analysis, the ALJ considers the medical severity of claimant's impairments, and if claimant has an impairment that meets or is equal to one of the

impairments listed in the appendix of this section and meets the duration requirement, the claimant is disabled. *Id*. At step four, the ALJ considers the assessment of claimant's RFC and his past relevant work, and if claimant is still able to do his past relevant work, claimant is not disabled. *Id*. During the last step of the evaluation process, the ALJ considers claimant's RFC assessment, age, education, and work experience to determine if claimant can make an adjustment to other work, and if the adjustment can be made, claimant is not disabled. *Id*. The burden of proof for steps one through four is on the claimant, however, the burden shifts to the Commissioner at step five. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

The district court is vested with jurisdiction to review the Commissioner's denial of benefits. 42 U.S.C. §1383(c)(3). However, the court's standard of review on disability cases is limited. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation and quotation marks omitted). The court must determine whether the final decision of the Commissioner is supported by substantial evidence and is based on the proper legal criteria. *Id*. (citation omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citations and quotations omitted). If the Commissioner's findings are supported by substantial evidence, the ALJ's decision will be conclusive. *Id*.

While reviewing the record, the court will conduct a critical review of both the evidence that supports and detracts from Commissioner's final decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citations omitted). In addition, the court will review whether the ALJ rationally articulated the grounds for his decision, and a remand may be required if the ALJ failed to "build an accurate and logical bridge from the evidence to the conclusion." *Steele v. Barnhart*, 290 F. 3d 936, 941 (7th Cir. 2002) (citations and quotations omitted). However, the court must not attempt to substitute its judgment for the ALJ's "by

reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)).

## III.  DISCUSSION

### A. The ALJ's Finding

Pursuant to Social Security regulations, the ALJ made the following findings as to Cooper's claim. At step one, the ALJ found that Cooper has not engaged in substantial gainful activity since the date of her DIB application, July 7, 2004. (Tr. 17). At step two, the ALJ determined that Cooper "has the following severe impairments: asthma; chronic obstructive pulmonary disease ("COPD"); sleep apnea; hypothyroidism; and status post thyroidectomy."(Tr. 17). At step three, the ALJ found that Cooper's impairments or combination of impairments does not meet or medically equal a listed impairment. (Tr. 19). At step four, the ALJ made the following finding as to Cooper's RFC determination:

> [T]he claimant has the residual functional capacity to perform light work. The claimant can occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds. The claimant can sit, stand and/or walk six hours of an eight hour work day. The claimant can push and/or pull objects weighing twenty pounds or less. The claimant should avoid work around unprotected heights and dangerous moving machinery. She should work in an environment free of noxious fumes, gases, respiratory irritants, and extremes of temperature and humidity.

(Tr. 20).

At step four, the ALJ found that Cooper was unable to perform any past relevant work. (Tr. 23). At step five, the ALJ denied Cooper's claim because ALJ found that there were a significant number of jobs in the national economy that Cooper can perform. (Tr. 23).

## B. Cooper's Argument on Appeal

Cooper makes two arguments on appeal. First, Cooper argues that the ALJ erroneously dismissed the opinion of the medical expert. Second, Cooper argues that the ALJ wrongfully equated activities of daily living to the ability to engage in full time work. Each argument is addressed below.

### (1) Dismissal of the medical experts opinion

Cooper argues that by rejecting every one of Freeman's opinions, the ALJ has improperly substituted his own judgment for that of a medical professional. Cooper is mistaken in this assertion. In *Rohan v. Chater*, 98 F. 3d 966 (7th Cir. 1996), the Seventh Circuit warned ALJs against the desire to substitute their lay opinions for those of a medical expert. In *Rohan*, the ALJ disregarded objective medical evidence of plaintiff's limitations without expressly relying on any medical evidence or authority and ultimately was reversed. *Id.* at 970; s*ee also Schmidt v. Sullivan*, 914 F. 2d 117, 118 (7th Cir. 1990) (warning against the temptation of the ALJ to play doctor). However, unlike the case in *Rohan*, the ALJ in the instant case expressly considered the medical record when deciding not to give any weight to the opinion of Freeman. The ALJ gave three reasons for not considering Freeman's opinion and they are substantiated by the record.

First, Freeman opined that Cooper's combined impairments equal a listing 11.03. Freeman based her finding in part on Cooper's diagnosis and treatment of a vitamin B12 deficiency. Freeman testified that Cooper's treatment for this condition was probably inadequate and could lead to problems such as depression, pseudo-dementia, anemia, or neuropathy. Freeman further testified that Cooper's diagnosis of depression taken from a mental status evaluation performed by Wooden in March of 2005 may rise to level which would render her disabled. The ALJ found this statement inconsistent with the findings of Wooden's report.

Wooden diagnosed Cooper with dysthimia and secondary anxiety, and assigned a GAF of 70 which is indicative of only mild symptoms. In addition, the ALJ determined that Wooden's conclusion was supported by treatment notes completed at Madison Avenue Family Practice which described her anxiety either as being controlled by her medication or in good condition. (Tr. 645, 730).

The second reason the ALJ assigned no weight to Freeman's testimony dealt with the severity of Cooper's pulmonary impairment. Freeman diagnosed Cooper with an interstitial lung disease, also known as Churg-Strauss syndrome, which causes a fibrosis and inflammation of the membrane which precludes the ability of oxygen to reach the blood stream. The ALJ observed that this diagnosis was not noted in the record and thus contradicted the evidence in the record. In addition, the ALJ referred to the February 19, 2008 notes prepared by Daly, which reflected that Cooper's pulmonary function studies continue to show improvement and with the injections of Xolair, Cooper required little to no medication. The ALJ also referred to several treatment notes dated November 2007 through March 2008 which described Cooper's pulmonary status as "doing well." (Tr. 803-14).

Finally, the ALJ gave little weight to Freeman's testimony regarding the severity of Cooper's sleep apnea. Freeman's findings were based on self-reports Cooper made during her mental status evaluation with Wooden and the results of a 2001 sleep study which was conducted prior to Cooper's treatment with CPAP. The ALJ referred to subsequent treatment notes completed after the sleep study which indicated that her sleep disorder was controlled with CPAP therapy. In addition, the ALJ referred to Shellman's notes from 2003 indicating that Cooper's excessive somnolence was attributed in part to Cooper's failure to take her medication.

The ALJ, while giving no weight to Freeman's testimony, did not substitute his own lay opinion for that of a medical professional. The ALJ relied on the substantial evidence included in the record which did not comport with Freeman's findings. It is not this Court's duty to reweigh the evidence presented; instead the Court must determine whether the ALJ's decision is supported by substantial evidence. The Court was able to trace the path of the ALJ's reasoning and substantial evidence supports the ALJ's decision and, accordingly, Cooper's claim that the ALJ erred by dismissing the opinion of the medical expert is rejected.

**(2) Wrongful equation of activities of daily living**

Cooper argues that the ALJ's decision wrongfully equates activities of daily living to the ability to engage in full time work. In addition, Cooper questions the fact that in determining her daily activities such as preparing meals, performing household chores, doing yard work, and transporting her children to errands and appointments, the ALJ did not cite to the record where it would be noted that she actually performs these activities. Cooper claims that the ALJ's determination is contradictory to the reality of what it is in the record.

However, Cooper's claim is misguided. The ALJ's finding of Cooper's significant daily activities did not equate to her ability to engage in full time work. The ALJ addressed the credibility of Cooper's statements concerning the intensity, persistence and limiting effects of her symptoms and gave various reasons why he did not find her statements credible, which included her significant activities of daily living.

The record contains several instances where it is noted that Cooper actually performs the daily activities determined by the ALJ. First, in a questionnaire sent to Cooper by the Social Security Administration ("SSA") on December 16, 2004, Cooper answered that she does laundry twice a week, house cleaning which includes washing dishes, and driving or getting a ride to get

around town. (Tr. 73, 74). Cooper stated that she does not vacuum or dust because of her allergies. (Tr. 73). Second, during a telephone conversation between the SSA adjuster and Phyllis Lee, Cooper's sister, Lee stated that Cooper runs some errands, goes to doctor appointments, cooks and does simple chores. (Tr. 72). Third, the psychiatric review technique form completed by Pressner on April 1, 2005, revealed that Cooper drives, reads, does minor house cleaning, cooking and laundry. (Tr. 172). Finally, as to the yard work, Cooper's treatment records from April 24, 2007 with Daly reveal that she had an asthma attack while doing yard work (Tr. 419), and that during a May 15, 2007 visit with Daly, he noted that Cooper was doing okay and used a mask for yard work. (Tr. 417).

The ALJ addressed the credibility of Cooper's testimony and found it not credible as to the intensity, persistence and limiting effects of these symptoms by giving several reasons, one of which was her activities of daily living. Contrary to Cooper's assertions, there are various areas of the record that address Cooper's activities of daily living. The ALJ's decision was not a gross error, and consequently remand is not warranted for this reason.

## IV. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is hereby **AFFIRMED.**

SO ORDERED.

Date: 03/29/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

- **Charles D. Hankey**
  charleshankey@hankeylawoffice.com

- **Thomas E. Kieper**
  UNITED STATES ATTORNEY'S OFFICE
  tom.kieper@usdoj.gov